494

FMC CORPORATION, Plaintiff,

v.

The CITY OF GREENSBORO, Defendant.

Civ. A. No. C-57-G-60.

United States District Court
M. D. North Carolina,
at Greensboro.

Aug. 28, 1962.

As Amended Sept. 3, 1962.

---

Schneider, Dressler, Goldsmith & Clement, Chicago, Ill.; McLendon, Brim, Holderness & Brooks, Greensboro, N. C., of counsel; R. Howard Goldsmith, Chicago, Ill., Thornton H. Brooks, Greensboro, N. C., Charles W. Ryan, Chicago, Ill., for plaintiff FMC Corporation.

Victor Myer, Olson, Mecklenburger, von Holst, Pendleton & Neuman; Louis Robertson, Darbo, Robertson & Vandenburgh, Arlington Heights, Ill.; Welch Jordan, Jordan, Wright, Henson & Nichols, Greensboro, N. C.; Jack Elam, City Atty. of Greensboro, N. C., of counsel, for defendant.

HAYES, District Judge.

The Forrest Patent No. 2,777,815, granted January 15, 1957, on an application filed June 8, 1953, embodies a sewage digestion process. It teaches the

method of continuously injecting methane-containing digester gas under pressure near the bottom of the tank and at the center by releasing gas under prescribed conditions of force propelling it to the top of the surface and rolling it from the center to the circumference, down the sides of the container, back to the bottom and up again in the same circular, continuous movement. This method contemplated the inter-mixture of the gas with the sludge and keeping it in continuous motion, which would prevent scum from forming and the solids from settling at the bottom until the sludge was fully digested. The method also contemplated the continuous movement of the gas when raw sludge was introduced into the container or while withdrawing digested sludge. The patent teaches that by this process the sludge becomes thoroughly digested in a 10-day period, whereas under the conventional method prior to that it required 30 days for the operation. This process also resulted in reducing storage capacity to one-third of what was required under the conventional method.

The City of Greensboro, in 1938, in establishing the sewage plant, erected two tanks, each 75 feet in diameter and 17½ feet deep, which were adequate to take care of the sewage flow at that time by the conventional method. But by 1958 the City's sewage and commercial waste had increased about three times, making it necessary to increase the sludge facilities or make some other provisions. The City employed capable engineers of New York, Hazen and Sawyer, to prepare necessary plans to meet these difficulties, and they had prepared plans for the construction of two additional tanks, each of which was 90 feet in diameter, at a cost of $270,000.00 to meet the current and anticipated needs of the City of Greensboro.

When these engineers were made aware of the new process of Forrest, they discovered that by using the Forrest process they could get along with their present sludge equipment and avoid the construction of the two anticipated tanks

and thereby save the City a net sum of $210,000.00.

Competitive bids were submitted by the Chicago Pump Co., Assignee of the Forrest Patent, Pacific Flush Tank Co. and by Walker Process Equipment, Inc. The contract was awarded to Walker Process Equipment, Inc., which agreed to accomplish the result contemplated by the Forrest Patent without the payment of any royalty for its use and under a guarantee by Walker Process Equipment, Inc., to hold the City of Greensboro harmless against any expense, costs or damages that it might incur for infringing the Forrest Patent. In this way the City of Greensboro was able to use the benefit of the Forrest Patent without paying any royalty therefor. When Food Machinery and Chemical Corporation, the parent corporation of Chicago Pump Company, filed a suit against the City of Greensboro for damages, Walker Process Equipment, Inc., took charge of the defense in behalf of the City and conducted its defense throughout the trial.

The taking of testimony in the case consumed five full weeks, and one full day was devoted to oral arguments. The defendant, City of Greensboro, by Walker Process Equipment, Inc., has denied infringement, denied the validity of the Forrest Patent and pleaded unclean hands against equitable relief. The principal witness for the plaintiffs was the patentee, Mr. Forrest, who was an exceptionally capable engineer and impressed the Court as being scrupulously honest in his testimony. The Court, therefore, feels it can rely on and accept his testimony as being true. It has been substantiated by documentary evidence in numerous instances.

Mr. Forrest and Messrs. Lamb and Klein were regular engineering employees of the Chicago Pump Company, and Dr. Morgan was employed as a consultant. During a long period of time experiments were conducted by him in a laboratory and by Lamb, Klein and Forrest for the purpose of devising improvements in the treatment of sewage

by means of which the digestion of it could be perfected in much less time than required in the conventional method, and as a result of these experiments and tests the patent attorneys for the Chicago Pump Co. prepared and filed with the Patent Office applications by Lamb and Klein covering certain phases of their investigation, and by Forrest on the subject matter of the patent in suit, both applications being filed on the same date, to-wit, June 8, 1953. The Patent Office rejected the application of Lamb and Klein II on the teachings of German Patents Nos. 1 and 2, but allowed the Forrest Patent in suit over the German Patents, and Lamb and Klein II and over references No. 1,820,976, Imhoff, September 1, 1931; No. 2,190,598, Fisher, February 13, 1940; No. 2,528,449, Genter, et al. November 7, 1950; No. 2,638,444 Kappe, May 12, 1953; and No. 2,640,027, McNamee, et al, May 26, 1953.

Claims 1, 2, 4 and 8 of the patent in suit are at issue in this case, and those claims are set forth in the footnote as follows.[1]

The Forrest Patent embodies many well-known features in the art which are utilized in the patent in connection with new features that he invented with the result that the combination effects a satisfactory digestion of the sludge in one digester tank by an accelerated digestion in a period of 10 days as against the 30 days formerly required by the conventional process. In the conventional method of digesting the sludge in one tank without the Forrest process, it required a period of 30 days, and in that method the solids settled at the bottom of the tank over which a layer of supernatant liquor was formed and over this was a layer of scum to cap it over. Forrest refers to attempts theretofore made to effect the acceleration of digestion of sewage sludge by agitating the contents of the tank using compressed gases, including gases generated during the digestion process, sometimes called "digester gas" and mechanical agitators were utilized to produce motion in the material undergoing digestion, as disclosed in German Patent 441,851, dated January 20, 1925, referred to as German Patent No. 1, and German Patent No. 2, being 492,809, dated March 20, 1930.

The prior art taught some agitation or stirring of the digesting sludge in some sections or portions of the tank either

---

1. "1. In the anaerobic digestion of sewage sludge, the improvement comprising the steps of continuously circulating methane-containing digester gas within an enclosed container containing sludge undergoing digestion to digest the sludge, removing at least a portion of the digested sludge from said container and introducing the same into a second container, and holding the digested sludge in said second container in a quiescent state to enable the digested solids to settle to the bottom thereof, the removal of the digested sludge from said first mentioned container being effected without interruption of the flow of digester gas within said first mentioned container.

"2. The method of claim I wherein said gas is circulated in said first mentioned container at a sufficient rate to thoroughly intermix the digester gas within the sludge contents of said container.

"4. In the anaerobic digestion of sewage sludge wherein methane-containing digester gas is recirculated within an enclosed container containing the sludge undergoing digestion to digest the sludge, the improvement comprising removing portions of the digested sludge from within said container without the interruption of the flow of digester gas therein, and then introducing said removed sludge to a second container and maintaining it therein in a quiescent state to enable the digested solids in said sludge to settle to the bottom of said container.

"8. In the anaerobic digestion of sewage sludge wherein methane-containing digester gas is recirculated within an enclosed container containing the sludge undergoing digestion to digest the sludge, the improvement comprising removing portions of the digested sludge from within said container without the interruption of the flow of digester gas during the removal, introducing said removed sludge to a second container and maintaining it therein in a quiescent state to enable the digested solids in said sludge to settle to the bottom of said second container, and removing settled solids from said second container."

by mechanical mixers or stirrers or Fisher's razzle dazzle (propellers mounted on a shaft which stirred locally where the propellers moved) or Kappe and McNamee with gas in the scum area. Lamb and Klein I had some stirring with small amount of gas, but insufficient to perform the thorough movement of the entire contents of the tank as taught by Forrest. Experience had demonstrated that grease balls would form and solids would settle in those sections of the tank where movement ceased. Propellers clogged with accumulated particles thus hampering their functions. For this reason mechanical mixers never succeeded. It is obvious that gas directed solely to the scum problem had no appreciable effect on the entire contents of the tank.

There is some argument whether Forrest's process accelerates digestion by the contact between the sludge with the recirculated gas within the digester or whether it results from the complete rotary circulation of the entire contents of the tank. He teaches that the continuous recirculation of the digester gas in the prescribed amount to create a rotary circulation of the entire contents of a velocity of ½ to 1½ feet per second will accelerate the digestion and complete it in 8 to 10 days. If it produces that result by pursuing the steps he teaches whether the gas contact or movement, or both combined do it, the novelty is there, and resides in how to do it.

But Forrest asserts that the prior art workers did not appreciate that contacting the sludge undergoing digestion with digester gas under controlled conditions, whereby both the velocity of movement of the circulating sewage undergoing digestion, and the rate at which the digester gas is recirculated in the sludge are held within certain well defined limits, is important to the operation of anaerobic digestion process on a commercial basis. Forrest then describes his discovery that sewage sludge can be digested under anaerobic conditions in a relatively small digestion tank in a commercially feasible operation, by effecting the digestion with the aid of digester gas

introduced into the materials undergoing digestion at the rate of about ⅛ to 2 cubic feet per minute per foot of longest horizontal internal cross sectional dimension of the tank and under conditions such that there is established and maintained in the material undergoing digestion a generally circular motion of a velocity of about ½ to 1½ feet per second. The gas is discharged uniformly into material undergoing digestion, preferably in a diffused state and over an appreciable area of the tank, from the region located preferably in the center and lower third of the tank. The gas rises in an upward direction after discharge. With this controlled discharge of digester gas within the body of sewage sludge undergoing anaerobic digestion, there is effected an accelerated decomposition of the volatile organic constituents of the sewage sludge and the time of digestion of sludge is markedly reduced from about 30 days of the present commercial process (digestion) to about 10 days and in many cases to about 8 days. This process is claimed in copending application Serial No. 360,282, by Lamb and Klein, treated herein as II. However, in Lamb and Klein, when digestion is completed, it is necessary to interrupt the flow of gas in the digester tank to allow the digested solids to settle to the bottom thereof, which might require several hours. The following is an important feature of Forrest: "In order to enhance the efficiency of the digestion process above referred to, it is desirable to provide a system wherein the flow of gas recirculated in the digester tank is not interrupted." This was solved by utilizing a tank which he denominates as a settling tank, to which the digested sludge mixture is fed. In this regard "the separation of the digested solids from the liquid portions of the sludge mixture therefore takes place in the settling tank and without interrupting the continuously recirculated gas in the digester tank," or interrupting the speedy digestion taking place therein.

The gas diffusing device is not restricted to any particular type, but it

does specify that it covers an appreciable area in the bottom central portion of the digester tank so that a large rising column of diffused gas is generated within the sludge undergoing digestion in the digester tank. "This causes the sludge to circulate upward in the central portion of the digester tank and then downward along the sides thereof in a generally circular direction." When done in accordance with the teaching of the patent, the digestion of the sludge is accelerated to such an extent that the period necessary for complete digestion of sludge is materially reduced from the time previously required to about 10 days and even less. It then specifies the rate at which this must be done and points out the hazards if it is not done in the manner taught. Again, the patent teaches that it is not only important to create the continuous rotary motion of the sludge by the diffusion of gas, but the importance of maintaining the contents of the digester in this continuous motion. It is plain from the patent that to cut off the flow of gas permits the solids in the sludge to settle to the bottom, a layer of supernatant liquor above it, and a layer of scum to accumulate at the top, as has occurred by the conventional method. Herein lies the distinction of the Forrest invention over the two-stage digestion system then known in the art by which the sludge was partially digested in one container, then transferred to another where it underwent further digestion. The Forrest patent requires the complete digestion in the one tank and the withdrawal of digested sludge to a settling tank where it can settle without interfering with the continuous circulation of the contents of the digester tank. The emphasis in the Forrest Patent resides in the continuous circulation and digestion of the sludge in the sludge digester and withdrawing the digested sludge to a settling tank where it can settle and be disposed of without interrupting the digestion process in the digester tank. The digester tank with the Forrest process was a time saver. Forrest alone saw the futility of shutting it down in order for the solids to settle and to be removed; so he taught its continuous operation without interruption even while withdrawing the digested sludge into a second container, not a second digester. The Court is of the opinion and so holds that the Forrest Patent contained several novel steps in a process which produced a new result that was commercially valuable and is patentable.

It was not a mere aggregation of old concepts, the sum of which could produce the same result. It utilized in combination form the means to accomplish a new result by achieving much faster digestion than known before on a large scale for long duration. Pursche v. Atlas Scraper and Engineering Co., 9 Cir., 300 F.2d 467.

The Forrest process was not obvious enough for any other person skilled in the art to discover it. It had been used by Forrest four years before WPE employed it.[2] It is interesting to note that in January, 1957, Dreier observed that "the severity of the scum problem started a revival of interest in various forms of digester mixing, as did higher rates of digestion * * * design engineers want active digester circulation in either standard or high rate digesters, both for scum breaking and for homogenizing the digester contents." Between then and June 1957, WPE made drawings for a gas lift, consisting of eductor tubes with gas lifter units clustered therein, but the tubes were spaced apart in the centroids of the tank. These proved unworkable.[3] Its first drawing of only one

2. In June, 1954, a year after Forrest filed his application WPE was still promoting sales of its mechanical mixer and said— "The gas recirculation system should be 'debunked' wherever possible."

3. PX 107, WPE asserts: "The gas lifter is always installed in the center of the tank to maintain a mass circulation from the center to the outside in any size digester. At first glance, in larger units, it would seem that three or four gas lifters distributed on the centroids of the segments of the digester plan would be the logical place to install these units.

gas tube located in the central area of the tank as taught by Forrest was June 18, 1957. Its first installation was at its Aurora plant in Oct. 1957, which produced "dramatic results".[4] Thereafter it had a steady growth: 30 in 1959; 64 in 1960 and 88 by January 1962. Rawn experimented with the gas lift and abandoned it because he saw no benefits. The record contains a lot more evidence showing a lack of obviousness and the novelty of the Forrest process.

■ WPE had available and evidently utilized the Forrest invention in arranging its system which embodies every step of the Forrest process. Copying the patentee's invention is some evidence of novelty. Colgate-Palmolive Company v. Carter Products, 230 F.2d 855, 862, (4th Cir.). The doctrine is approved in Universal, Inc. v. Kay Manufacturing Corporation, 301 F.2d 140, 148 (4th Cir. 1962) where Judge Soper said: "In the present instance particularly the value of the invention is shown by the action of the defendant itself who, guided by long and successful experience in the manufacture of furniture springs, incorporated the idea of the patent in suit in its own line of goods after the plaintiff demonstrated its advantages to the purchasing public."

## PRIOR ART.

The defendant has brought to the attention of the court about 40 prior art publications, patents, and usages. But it has stressed only the following which it claims are more directly in point, to-wit:

German 1 and 2 previously mentioned; Lamb and Klein 1 and 2 previously mentioned; Fisher, Kappe and McNamee patent and the usage by Rawn. It is significant that the patent Examiners allowed the Forrest patent over everyone of these alleged prior arts. The same Patent Examiner who rejected Lamb and Klein's No. 2 on the strength of German's 1 and 2 patents allowed the Forrest Patent. The evidence clearly establishes that neither one of them teaches the invention of the Forrest Patent and does not constitute prior art to invalidate the Forrest invention. WPE sought the advice of its patent attorney who made a long and thorough study of these items and found neither one anticipated the Forrest Patent.[5]

■ First, the Rawn work was abandoned. It was an extreme multi-stage digester system consisting of twelve digesters, each of which digested the sludge some and passed it on to be further digested in each tank. Although Rawn was capable and experienced in this field, he gave up the idea of the gas lift because he failed to understand what could have been accomplished by the process steps of the Forrest Patent. Rawn had stratification of the sludge and solids settled to the bottom. He was unable to

However, if this is done, we would get into the same problem that resulted with multiple mechanical mixers installations. It was found that with such mechanical mixture installations that between the individual circulating zones an uncontrolled turbulence was produced that resulted in intermediate deposits of scum or grit that reduced the effectiveness of the mixing very materially."

4. PX 18 WPE said: "It is dramatic that at the Aurora plant one digester tank is digesting all of the primary sludge from that plant. This is particularly outstanding when one considers that not over two years ago two additional digesters were built and put into operation at Aurora because the plant was considered overloaded. (The document is dated Sept. 2, 1958.) Now one digester is carrying the entire plant load."

5. "We have not yet found any prior art which completely anticipates this (Forrest) patent, nor any prior art early enough to defeat the patent and which anticipates exactly what you do. Accordingly, you must recognize the possibility that even after an expensive defense in litigation a court might conceivably hold the patent valid and you might be obligated for the royalties which will then be required."

PX92A, "The greatest danger we see is in the fact that both C.P.C. (Forrest) and you achieve much faster digestion than is known to have been achieved before, at least on a large scale for long duration."

find that his gas lift made any difference and abandoned it. Certainly an abandoned experiment which failed does not invalidate a patent. "Patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

German Patents I and II were never reduced to practice. German I and II taught gas contact as did Lamb and Klein I and II which were rejected by the Patent Office. Lamb and Klein I released a small amount of gas bubbles in the sludge and Lamb and Klein II increased the amount, but was basically the same as I. Both were concerned with obtaining a supernatant liquor and the sludge solids settled in that container. They had to shut off the gas to let the solids settle and to get the desired supernatant liquor. The Examiner rejected them on the German Patents I and II but he found in Forrest process steps not contained or suggested in either of the four.

German II is the prior art on which the defense mainly relies. It exhibited before the Court a model for demonstration. The model in important features differed from the German Patent. Parallel heating pipes were stationed in the container and in close proximity to heat the sludge. It was soon discovered that sludge particles gathered around these pipes and virtually insulated them against emitting heat. To overcome this problem German II was directed by inserting below these heating pipes a perforated gas pipe to force these particles away from the pipes which incidentally created some gas lifting and rolling of the sludge but there was no teaching as to the amount of gas or velocity of the contents nor accelerating the digestion and completing it in one digester. It had one digester divided by a wall, making Section A where the gas was released and Section B where there was less movement of the contents. It fell far short of the teachings of the Forrest Patent. Forrest's teachings result in a complete rotary motion of the entire contents instead of directing it to the heating pipes or the scum problem as in Kappe and McNamee. Forrest's was a successful commercial operation while German I and II were never put into operation.

Kappe and McNamee were solely directed to the solution of the scum problem, each pursuing a different course. Kappe arranged a weir over his gas lift in order to moisten the scum and dissolve it in place; McNamee released gas underneath the scum to break it and digest it there. Neither one taught spreading it from top to bottom nor how to accelerate the digestion. Neither anticipates Forrest.

Fisher was a two stage digester plan and therein radically differs from Forrest. He demonstrates better than any others a method of stirring the contents with a mechanical mixer for he has a shaft on which are mounted propellers (or paddles) spaced about three feet apart which are propelled by the revolving shaft. These propellers moved the contents with which they came in contact and created movement of a kind but fell far short of Forrest's gas lift. Moreover the propellers gathered hair and other material which hampered the process and created an expensive and troublesome operation. It did not anticipate Forrest. There are numerous declarations by WPE which show the marked differences between these devices and the gas lift system but these declarations are also pertinent to the infringement charge and will be cited there to avoid repetition.

■■ WPE's experts and its counsel do not contend now that any single prior art anticipates Forrest but, in effect, they do lump them together and conclude that Forrest is fully anticipated. This is inconsistent with the proper use of prior art. S. D. Warren Co. v. Nashua Gummed and Coated Paper Co., 205 F.2d 602, 605 (First Cir. 1953). Prior art must convey in its four corners sufficient directions to enable one skilled in the art to practice the teaching of the patent in order to anticipate. Dewey & Almy

Chemical Co. v. Mimex Co., 124 F.2d 986, 989 (2 Cir. 1942). Judge L. Hand stated the principle to be: "No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated". Stead Lens Co. v. Kryptok Co., 214 F. 368, 375 (8th Cir.). The combination of old elements to produce a new and better result is recognized as patentable. Pursche v. Atlas Scraper and Engineering Co., 300 F.2d 467 (Ninth Cir. 1962), but it does not follow that you can combine them to constitute anticipation.

## INFRINGEMENT.

■ There is an abundance of evidence to show and the court finds that the Greensboro operation under the teachings of WPE infringe the Forrest process claims 1, 2, 4, and 8. The accused employs every step of the Forrest process. Until this suit was filed, WPE asserted that it and Forrest by the gas lift system operated in the same way, the same conditions and got the same results.[6] Both obtained by the employ-

---

6. The following excerpts from WPE documents speak for themselves:

a. PX 5. "By clustering all of the circulation energy in the center of the digester, an overall powerful roll of the tank is effected; and local isolated recirculation loops, so often attendant with mechanical propeller pumps, are completely avoided. The radial roll will completely circulate a digester, with low horsepower and without mechanical shutdowns."

"The gas lift liquifies and completely circulates the digester contents no matter how dense the sludge may be. Thorough circulation is accomplished combined with a rapid radial surface movement which sweeps all grease and scum accumulations into the homogenized digester mass. Incoming green sludge is readily admixed and thoroughly homogenized with 'seed' so as to accelerate its digestion and thereby allow maximum digester loading under the best possible conditions."

b. PX 98. "We definitely know that the gas lifter is adequately circulating the digester contents. Test samples taken at regular intervals at Aurora indicate complete homogenization of the digester contents from top to bottom (better than 4%), with samples being taken from the center zone and outer periphery of the tank from top to bottom."

c. PX 18. "It is interesting to consider that digester mixers have never been effective until Walker Process and Chicago Pump Co. came along with their Gaslifter mixers."

"Among ourselves we will have to admit that Chicago Pump Co. is able to mix a digester as well as we are. * *"

"Chicago Pump Co. does have a patent in which they claim that the success of their system is based on the catalytic effect from the contact between the gas released for gas mixing and the contents of the digester. We know that if this is true that we are getting the same result from our Gaslifter unit. * * *"

d. PX 103. "I also advised him that there was competitive equipment by Chicago Pump Co. on the same or near the same idea but with different mechanical makeup."

e. PX 108. "This is a good reason why our continuous recirculation radially out from the center of the digester causing an overall roll and an actual entraining and homogenizing of the grease with the digesting mass is far superior to the intermittent operation of the Pearth (PFT) McNamee) system. PFT has distended the gas release * * * below the surface in order to emulate the circulatory action of Chicago Pump Co. and ourselves. * * * Their circulation effort is deployed into several regions so that they are circulating intermittently from the centroids of several regions. They operate these units singly and as a result, they create only a local disturbance and an unbalanced condition which aids in the formation of these large greaseballs."

f. PX 101. "Walker Process Equipment, Inc. guarantees that the digester Gaslifter mixing equipment we propose to furnish for the installation shall provide adequate circulation and mixing of the sludge throughout the digester tank and, while the mixer is in operation, shall provide a uniform mixture of sludge solids within the digester, within practical limitations without objectionable scum formation."

g. PX 102. "There is no doubt that the accelerated digestion that we are getting at Aurora, for instance, is accomplished simply because we are getting more intimate mixing between the di-

ment of releasing the gas in the central portion a radial rotary movement of the entire contents from center to circumference, holding the entire contents in suspension and thoroughly mixing to digest the sludge, and accelerating digestion, accomplishing the digestion in one third the time and correspondingly reducing storage space to one third. These results were obtained by the continuous gas recirculation while adding new sludge and withdrawing digested sludge into a second container where the solids settled without interrupting the digester. Thus the City's operation embodied every step of the Forrest process at least during the 41 days of continuous operation. Applying to these facts the law as stated in Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 and Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733, the patent is valid, not anticipated by the prior art and is infringed. These cases involved a process patent for incubating eggs, although the instant case involves

a process patent for sewage digestion, the cases are analogous in many respects.

■ If the elements of the patent are utilized by the infringer, he does not avoid infringement by using a different mechanism to accomplish the same result and in substantially the same manner. Smith v. Snow, supra. This is true although the means may be less effective or even better. Waxham v. Smith, supra, at page 23, 55 S.Ct. 277. "If two devices do the same work, in substantially the same way, and accomplish the same result, they are the same, even though they differ in name, form or shape." Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097; Matthews v. Allen, 182 F.2d 824 (4th Cir. 1950).

The gas release by defendant inside the tube is from a cluster of openings from the three gas pipes. It gives the gas lift by pushing upward and by suc-

gested seed enzymes and the green sludge pumped into the digester. * * * Then why should we expect the digester to work well when we have divided zones within it and pockets of green sludge that don't have any contact with digestive enzymes at all? Accordingly, we argue that it is this mixing that causes accelerated digestion."

h. PX 110. "Loadings of 0.3# total solids cubic feet per day will require continuous mixing by any device in order to homogenize the heavy grease load resulting from this high loading."

i. DX 69. "Incoming raw sludge and grease is thoroughly homogenized and continually admixed with 'seed sludge' so as to accelerate its digestion.
"The entire digester volume is utilized and thereby allows maximum digester loading under the best possible operating conditions of biological and thermal homogeneity."

j. PX 95. "Accelerated digestion will be used more and more, and indications are that its successful use may supercede two stage digestion. * * *"

k. PX III. "A simple small settling tank can separate super natant from a well digested sludge in less than an hour and certainly is much cheaper than a second digester. * * * Many plants with multiple digester units are converting some of their second stage di-

gesters to first stage digesters by adding gas lifts, greatly extending the digestion capacity of the plant."

l. PX 121. "Since inadequately mixed and heated digesters methane and humus production is completed in the initial digester, storage of transfer material should not be considered as 'secondary' digestion".

m. PX 97. Comparing Dorr's (Fisher) device: "With this setup, our gas-lifter would far exceed the mechanical mixers specified in keeping bottom deposits suspended."

n. PX 98. "As you know, we—have built mechanical (propeller type) mixers for digesters for years. * * * However, the one stumbling block to continuous successful operation of mechanical mixers is maintenance."

"However, the most objectionable feature to mechanical mixing or pumping is occasioned by the stringy material in the sewage sludge. Even a small amount of this material on the leading edge of an impeller or propeller will foul its pumping characteristics and seriously reduce pumping capabilities. In many plants, the mechanical mixers have been abandoned because the cure was more troublesome or expensive than the disease, the operators simply got tired of fooling with the mixers."

tion from the bottom and thus create substantially the same lift in Forrest where no tube is employed. Both lifts create the same rotary action of the tank contents and maintain them in suspension; both prevent scum formation and the solids from settling provided the gas is fed continuously. Both recognize the necessity of continuous gas release. Both avoid the solids settling in the tank and both complete the sludge digestion in the one digester. Both fill raw sludge and withdraw digested sludge without interrupting the digestion process in the digester; both withdraw the digested sludge into a second container where the solids settle. While the defendant uses the second tank for the additional purpose of washing out the alkalinity, yet the tank functions as in Forrest and serves the same purpose.

 Greensboro ceased operating continuously and operated intermittently when plaintiff's counsel notified the City of infringing Forrest Patent. Intermittent operation does not infringe. Sears, Roebuck & Co. v. Minnesota Mining and Manufacturing Co., 243 F.2d 136 (4th Cir. 1957). The omission of an important step in a process patent avoids infringement. Continuous operation is essential in Forrest. However, the City has an enforceable contract with WPE to operate it in accordance with its specifications and indicates an intention to do so if it becomes advantageous, there is reason to believe it will recur to the infringement if not restrained. Matthews v. Allen, supra.

The court is not unmindful of the evidence at the trial on the part of Mr. J. D. Walker, President of WPE, and Mr. Douglas Dreier, vice-president and head of the engineering department of WPE, and Dr. Hatfield, the defendant's expert. At the trial these three witnesses in effect repudiated all of these statements which have been heretofore quoted from documents of the WPE on the theory that those statements were merely sales talk, and they now express the opinion that the statements are in error. As a basis for repudiating these declarations, the record clearly established that the three witnesses based their revised opinions at the trial on the so-called results obtained from skin diving tests. The so-called skin diving tests were conducted by Mr. Walker and Mr. Miller in a container of water into which air was released in an effort to simulate the functions of a gas lifter in a tank of digesting sludge. The court does not attach very much significance to the skin-diving tests for the reason that the observation made in a tank of water are certainly different from the contents of sewage sludge and the action of air released in water by no means establishes to this court's satisfaction that you would have the same result from releasing gas in the tank of sewage sludge. The court is not impressed with the explanation by these witnesses that those declarations in the documents heretofore cited are nothing but sales talk. In fact, the court cannot believe that, and yet all three of the witnesses gave that explanation.

The contradictions of the witnesses Walker and Dreier by their own record and the conflicting positions which they have taken from time to time concerning their operations cast a shadow of doubt over the weight which the court should give to their testimony, and while the court is convinced that the witness Hatfield is a very competent person, the weight one would normally ascribe to his testimony is mitigated in a large manner by reason of his manifest bias and combative attitude on the witness stand. He was hesitant to answer questions on cross examination which were capable of a simple answer, but repeatedly fired questions back at the attorney rather than to answer the ones propounded to him, and repeated this often after being remonstrated with by the court against that procedure.

With great ease he could locate a hint in some prior art to anticipate but could not discern a single new idea in Forrest. Such expert opinion is not convincing.

 The evidence fails to establish any conduct on the part of plaintiff

which would constitute unclean hands. Plaintiff had just grounds to believe that it had a useful and valid patent; it asserted in good faith its rights thereunder; it offered license agreements on fair terms to users including capable competitors and it did not tie in the use of the patent to force sale of its own equipment. It offered a license to Greensboro before and after the contract was awarded, but the City elected to gamble by utilizing the teachings of the patent and relying on WPE's guaranty. There is no valid reason to withhold equitable relief on the ground of unclean hands. The same grounds of unclean hands were involved and held insufficient in Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550, 569–573. One who in good faith believes he has a valid patent and that it is about to be infringed has a right to give notice of his patent and of his intention to sue if it is infringed. Flynn & Emrich Co. v. Federal Trade Comm. 4 Cir., 52 F.2d 836, 838.