**ENVIRONMENTAL DESIGNS, LTD. and the Trentham Corporation, Appellants,**

v.

**UNION OIL COMPANY OF CALIFORNIA and Ralph M. Parsons Co., Appellees.**

**Appeal No. 83–554.**

United States Court of Appeals, Federal Circuit.

July 25, 1983.

B.R. Pravel, Houston, Tex., argued for appellants. With him on the brief were

John R. Kirk, Jr., and Charles M. Cox, Houston, Tex., of counsel.

Andrew J. Belansky, Pasadena, Cal., argued for appellees. With him on the brief were John P. Grinnell and Leo J. Young, Pasadena, Cal., of counsel.

Before MARKEY, Chief Judge, and DAVIS and BALDWIN, Circuit Judges.

MARKEY, Chief Judge.

Appeal from a judgment of the District Court for the Central District of California holding claims 1–8 and 12 valid and infringed. We affirm.

## Background

In early 1975, Trentham Corporation (Trentham), the sole general partner of Environmental Designs, Ltd. (Environmental), announced the construction of an effluent gas treating plant using the Trencor process. On March 22, 1976, Environmental sought a declaratory judgment that U.S. Patent 3,752,877 ('877) for an effluent gas treating process known as the Beavon process, owned by Ralph M. Parsons Co. (Parsons) and licensed through the Union Oil Co. of California (Union), was invalid. Parsons and Union counterclaimed for infringement of claims 1–8 and 12. Trentham was joined as counterclaim defendant on March 17, 1978. Judge Pfaelzer tried the case during August and September of 1979 and entered judgment on August 18, 1982, holding the '877 patent valid and claims 1–8 and 12 infringed, enjoining Environmental and Trentham from infringing the claims of the '877 patent, and awarding Parsons and Union damages of $14,000.00.[1] Environmental and Trentham appeal from the holding of validity and infringement.

## The Invention

The established Claus process removes about 97% of an atmospheric pollutant (sulfur) from a gas stream. The Beavon process of the '877 patent in suit and the accused Trencor process remove the remaining 3% of the sulfur from the Claus process effluent.

The sulfur in the effluent includes elemental sulfur (S), hydrogen sulfide ($H_2S$), sulfur dioxide ($SO_2$), carbonyl sulfide (COS), and carbon disulfide ($CS_2$). The Beavon process uses hydrogenation in catalytically converting sulfur dioxide and elemental sulfur into hydrogen sulfide and simultaneously uses hydrolysis in catalytically converting carbonyl sulfide and carbon disulfide into hydrogen sulfide. The resulting effluent is then treated for removal of a single compound, hydrogen sulfide, rather than for the removal of several compounds present before the Beavon process is performed. The total amount of sulfur removed by the Claus and Beavon processes is 99.5% or more.

The '877 patent contains 12 claims of which claim 1 is representative:

1. A continuous process for reducing the sulfur content of effluent gas streams containing water, sulfur dioxide, carbonyl sulfide and carbon disulfide which comprises the steps of:

   (a)(i) enriching the effluent gas stream with a source of hydrogen to a level which is at least equal to the stoichiometric amount of hydrogen required to convert the contained sulfur dioxide to hydrogen sulfide and water and sulfur to hydrogen sulfide and

   (ii) catalytically hydrogenating at least essentially all of the contained sulfur dioxide to hydrogen sulfide and water and sulfur to hydrogen sulfide and

   (iii) simultaneously hydrolyzing carbonyl sulfide and carbon disulfide to hydrogen sulfide at a temperature from about 300 to about 800°F.,

   (iv) whereby contained water and water formed in the hydrogenation of sulfur dioxide to hydrogen sulfide are utilized for the hydrolysis of carbonyl sulfide and carbon disulfide;

---

1. A Trentham antitrust counterclaim was dismissed. A motion to add findings was filed by Environmental and Trentham. The court, after a hearing, denied the motion.

(b) cooling the hydrogenated gas stream to at least the dew point of water to condense water;

(c) separating condensed water from the hydrogenated gas stream; and

(d) treating the cooling hydrogenated gas stream to remove hydrogen sulfide.

## Issues

Did Judge Pfaelzer err: (1) in holding the '877 patent valid; (2) in holding that the '877 patent is not unenforceable for fraud on the Patent and Trademark Office (PTO); or (3) in finding that the Trencor process infringes the '877 patent?

## Opinion

Judge Pfaelzer entered 104 findings of fact and 18 conclusions of law. Environmental has failed to show that any of those findings were clearly erroneous or that any of those conclusions were either unsupported in the record or contrary to law.

### 1. Validity

The sole basis for Environmental's attack on validity of the '877 patent lies in its assertion that the invention would have been obvious under 35 U.S.C. § 103.[2]

■ Obviousness is a conclusion of law based upon fact determinations. As set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), and in *Stevenson v. U.S. International Trade Commission,* 67 Cust. & Pat.App. 109, 612 F.2d 546, 549, 204 USPQ 276, 279 (1979), those fact determinations involve (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the pertinent art, and (4) additional evidence, which may serve as indicia of non-obviousness. As is or should be true with every performance of the judicial process, all relevant evidence on each dispositive issue must be fully considered and evaluated. When a patent is challenged on the ground that the claimed invention would have been obvious, all evidence relevant to the obvious-nonobvious issue must be considered. *In re Sernaker,* 702 F.2d 989, 996, 217 USPQ 1, 7 (Fed.Cir. 1983).

### Scope and Content of the Prior Art

It is undisputed that the prior art consists of that considered by the PTO and the eleven U.S. and foreign patents, and six technical articles and brochures cited by Environmental at trial. Of the art cited by the PTO, the most pertinent are U.S. Patent 2,361,825 ('825) to Doumani, an article by Doumani in *Industrial and Engineering Chemistry,* and Australian Patent No. 223,904 ('904) to Thumm. Of the art cited at trial, the most pertinent are British patents 952,555 ('555) and 1,018,630 ('630), chapter 13 of the book *Gas Purification* by Kohl and Riesenfeld, and an article entitled "Hydrogen Sulfide Production from Sulphur and Hydrocarbons" by Bacon and Boe.

The Doumani references disclose the reduction of sulfur dioxide with hydrogen and that all sulfur dioxide will be converted to hydrogen sulfide when the ratio of hydrogen to sulfur dioxide is three or greater.

The Thumm '904 patent discloses treatment of a Claus process effluent containing sulfur dioxide, hydrogen sulfide, carbonyl sulfide, carbon disulfide and water vapor to vaporize elemental sulfur for discharge from the reactor with the gas stream. Thumm describes addition of steam to the effluent to hydrolyze carbonyl sulfide and carbon disulfide to hydrogen sulfide, and teaches that the hydrolysis occurs simultaneously with the Claus reaction.

---

**2.** 35 U.S. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The PTO thus had before it prior art which disclosed the hydrogenation of sulfur dioxide to hydrogen sulfide (Doumani); the hydrolysis of carbonyl sulfide and carbon disulfide to hydrogen sulfide (Thumm); simultaneity of certain chemical reactions (Thumm); and the composition of the Claus effluent (Thumm).

The '555 patent discloses hydrolysis of carbonyl sulfide and a simultaneous conversion of carbon monoxide with water to form hydrogen and carbon dioxide.

The '630 patent discloses hydrolysis of carbonyl sulfide and hydrogenation or hydrogenative decomposition of other, unspecified impurities present in gases "obtained by partial combustion of carbonaceous combustible materials".

The Kohl and Riesenfeld book generally discloses hydrolysis of organic sulfur compounds and the basic reactions for hydrolysis of carbonyl sulfide and carbon disulfide. It includes a passing reference to hydrogenation of sulfur dioxide.

The Bacon and Boe article discloses a process for commercial production of hydrogen sulfide. At one point in the reaction, the hydrolysis of carbon disulfide and a reaction involving methane and sulfur proceed simultaneously.

### Differences Between the Prior Art and the Claimed Invention

The Doumani references deal with a sulfur dioxide feed stream containing none of the other sulfur compounds found in the Claus effluent. It provides no indication that hydrogenation of sulfur dioxide and sulfur would or could proceed simultaneously with hydrolysis of carbonyl sulfide and carbon disulfide.

The Thumm reference discloses simultaneous hydrolysis of carbonyl sulfide and carbon disulfide, but says nothing about hydrogenation of sulfur dioxide and sulfur.

The teachings of the Thumm and Doumani references provide no indication that the specific hydrogenation and hydrolysis reactions of the '877 patent will occur simultaneously or that those reactions should be used in treating a Claus effluent.

The feed stream disclosed in the '555 patent contains neither sulfur dioxide nor sulfur. There is no suggestion in the '555 patent that hydrogenation of sulfur dioxide and sulfur would be essentially complete as required by the Beavon process.

The feed stream disclosed in the '630 patent contains no sulfur dioxide. There is no suggestion in that patent of essentially complete hydrogenation of sulfur dioxide, coupled with hydrolysis of carbonyl sulfide and carbon disulfide, as required by the Beavon process.

The feed materials of the Bacon and Boe article are only methane and sulfur. The feed materials of the Beavon process include no methane but include sulfur dioxide, hydrogen sulfide, carbonyl sulfide, and carbon disulfide.

Judge Pfaelzer found the prior art cited by Environmental cumulative, adding nothing to the art cited by the PTO. Environmental has not shown error in that finding.[3]

### Level of Ordinary Skill

██ Factors that may be considered in determining level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376 at 1381–1382 (Fed.Cir.1983). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a

---

**3.** Environmental argues that the '630 patent teaches simultaneous hydrolysis of carbonyl sulfide with hydrogenation of other impurities and thus is prior art not considered by the PTO. The '630 patent, however, does not teach simultaneous hydrolysis of carbonyl sulfide with hy-

drogenation of the specific impurities found in Claus effluents or that those reactions will take place simultaneously in the environment of a Claus reactor. Thus, the '630 patent adds nothing more pertinent to the art cited by the PTO.

particular case. The important consideration lies in the need to adhere to the statute, *i.e.,* to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of "ordinary skill in the art"—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand.

Judge Pfaelzer discussed various factors involved in determining ordinary skill in the art, but did not specify a particular level applicable here. Nor need she have done so, for the parties are in agreement that their respective chemical expert witnesses with extensive backgrounds in sulfur chemistry are persons of ordinary skill in the art.[4]

### *Additional Evidence*

Judge Pfaelzer found that the Beavon process of the '877 satisfied a long felt, but unfilled need because for the first time it enabled governmental bodies, *e.g.,* Los Angeles County, to adopt more stringent regulations for controlling sulfur dioxide emissions. She found that the invention achieved commercial success because a large percentage of the Claus effluent treating plants in the U.S. are based on the Beavon process. Environmental claims the need and commercial success were artificially generated by clean air legislation and should therefore not be considered.[5]

That the need was legislatively recognized in this case does not militate against its existence. There was a long felt need to remove as much sulfur as possible from the air we breathe. Judge Pfaelzer found that in 1948, the Air Pollution Control District (APCD) for Los Angeles County approved the first regulation limiting the amount of sulfur dioxide to 2000 ppm. Claus plants

were exempt from the regulation because even though they emitted approximately 115 tons of sulfur dioxide into the atmosphere per day, they prevented the emission of 885 tons of sulfur dioxide per day. APCD could not tighten its regulation because "known technical means of accomplishing the desired results" were not available. Judge Pfaelzer entered extensive findings reflecting recognition of the need and the failed efforts of others over time to meet the need. Despite meetings with the affected companies, studies of all known methods, research reports by governments and industries (including Trencor), no solution emerged until the Beavon process was invented.

Environmental has not shown the findings on long felt need to have been erroneous. Nor could it do so by mere citation of legislative recognition. That the desire of governmental bodies to mandate higher purity standards was frustrated by lack of technology thus dramatizes the need. This was not a situation in which an invention lay about unneeded until legislation was passed to create a need. That the Beavon process filled a pre-existing need and thereby freed legislatures to achieve their longstanding goal is strong evidence of nonobviousness.

As Judge Pfaelzer noted, highly probative evidence of nonobviousness resides in the expressions of disbelief by the chemical experts for both sides (Dr. Lana for Parsons; Dr. Hyne for Environmental). Before learning of the Beavon process, and with knowledge of earlier failed efforts, both stated unequivocally that they believed the reduction of sulfur compounds to hydrogen sulfide would not adequately solve the problem.[6] Expressions of disbe-

---

4. Environmental argues that Fred Riesenfeld, a Parsons employee who made an abandoned disclosure of a process similar to the Beavon process should have been included. That consideration, however, would not have resulted in a level of skill in the art different from that of the parties' experts.

5. Whether the Beavon process achieved commercial success because legislatively impelled need not be decided in this case. Judge Pfael-

zer did not give excessive weight to the finding. If she had, and if that had been error, it would have been harmless in light of all the evidence supporting her conclusion that the '877 patent is valid.

6. Dr. Lana testified that he had believed conversion of sulfur compounds to hydrogen sulfide was the wrong direction to go. In a technical article, Dr. Hyne expressed skepticism of

lief by experts constitute strong evidence of nonobviousness. *United States v. Adams,* 383 U.S. 39, 52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966).

Finally, Environmental points to three independent conceptions including the Riesenfeld disclosure, *supra* n. 4, an asserted 1966 proposal by Trentham's president to simultaneously hydrogenate sulfur dioxide and hydrolyze carbonyl sulfide, and the work of Shell Internationale which resulted in U.K. Patent 1,332,337 for a similar process. We need not discuss those conceptions here, for we agree with Judge Pfaelzer that the evidence concerning them is of insufficient probative force to establish obviousness.[7]

### Conclusion on Obviousness

■ All the pieces of the present invention were known in the art, *i.e.,* the equations for hydrogenation and hydrolysis of sulfur compounds, the simultaneity of chemical reactions, and the components of the Claus effluent. That all elements of an invention may have been old (the normal situation), or some old and some new, or all new, is however, simply irrelevant. Virtually all inventions are combinations and virtually all are combinations of old elements. A court must consider what the prior art as a whole would have suggested to one skilled in the art, *In re McLaughlin,* 58 Cust. & Pat.App. 1310, 443 F.2d 1392, 1395, 170 USPQ 209, 212 (1971). Judge Pfaelzer did just that. She then properly and fully considered all the evidence of record bearing on the validity issue, finding that the Beavon process filled a long felt need and had been denigrated by the experts. Her conclusion that the invention as a whole would not have been obvious at the time it was made to one of ordinary skill in the art was eminently correct.

### 2. Fraud

■ A party asserting the defense of fraud bears a heavy burden of proof which must be met by clear and convincing evidence. *Nelson v. Bowler,* 626 F.2d 853, 858, 206 USPQ 881, 885 (CCPA 1980); *Norton v. Curtiss,* 57 Cust. & Pat.App. 1384, 433 F.2d 779, 797, 167 USPQ 532, 546–47 (1970); *Orthopedic Equipment Co.,* supra, at 1383. Environmental argues that Parsons committed fraud on the PTO by failing to bring the Riesenfeld disclosure, *supra* note 4, and page 443 from the book *Gas Purification* to the attention of the PTO.

There was no duty, however, to bring to the attention of the PTO the Riesenfeld disclosure because it was a mere "conception" and was admittedly not prior art. Parsons did submit an affidavit by Riesenfeld setting forth Riesenfeld's opinion that the Beavon process would not have been obvious. That prosecution of a patent application is ex parte, involving PTO reliance on the candor and good faith of a patent applicant, requires that an affidavit should be accompanied by information known to the affiant and inconsistent with the affidavit. That Riesenfeld's disclosure was not prior art and that Riesenfeld could well have believed the process nonobvious under 35 U.S.C. § 103, notwithstanding his disclosure, indicate that failure to report the disclosure did not constitute fraud. Withheld information must be material, a condition we find here lacking. The disclosure not being prior art, it would not have been material to the patentability of the Beavon process.

Lastly, Parsons submitted page 444 from the book "Gas Purification" to the PTO. It did not submit page 443 which showed reactions for hydrolysis of carbonyl sulfide and carbon disulfide. Failure to submit page 443 is not evidence of fraud, however. It is undisputed that those reactions were known and were of record before the examiner in the PTO when page 444 was submitted. Fraud cannot consist of a failure to duplicate what is in the file wrapper.

---

replacing one toxic component of the effluent with another toxic component.

**7.** The virtually simultaneous making of the same invention does not in itself preclude patentability of that invention. Hence, the entirety of what is known as interference practice. 35 U.S.C. § 135.

Similarly, that Parsons represented computer examples as "operating" examples does not evidence fraud. When a second example was added to the application, and representations were made to the PTO, a pilot plant was operating and producing operating results that confirmed the computer examples. A report of those operational results is part of the file wrapper.

Judge Pfaelzer correctly found that Environmental failed to meet its burden of showing by clear and convincing evidence that Parsons committed fraud on the PTO.

### 3. Infringement

■ Environmental's Trencor process is a Claus effluent treating process. Judge Pfaelzer found that it includes the identical steps, i.e., hydrogenation, hydrolyzing, cooling, separating water, and removing hydrogen sulfide, as those of the process set forth in Claims 1–8 and 12 of the '877 patent, and that it thus falls squarely within the literal boundaries of the claims and constitutes infringement. Environmental has not shown error in the finding that the Trencor process is the same as, operates the same as, and achieves the same result as the claimed process. It thus constitutes not only literal but substantive infringement.

Environmental nevertheless seeks to avoid infringement on the ground that claim 1 must be read as including an unstated limitation ((c) separating condensed water from the hydrogenerated gas stream *prior to contact with an aqueous absorption solution*) not involved in the Trencor process. Environmental says the claims must be interpreted in light of the specification and that Parsons is estopped from asserting the claim without that limitation because it made certain remarks to the examiner in overcoming a rejection under 35 U.S.C. § 112.[8] Neither argument is persuasive.

The specification must be sufficiently explicit and complete to enable one skilled in the art to practice the invention, while a claim defines only that which the patentee regards as his invention. 35 U.S.C. § 112. The claim, not the specification, measures the invention, *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 420, 28 S.Ct. 748, 752, 52 L.Ed. 1122 (1908). Environmental's argument that claim 1 must include a limitation found in the specification is thus legally unsound. *Smith v. Snow*, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935).

Equally unsound is Environmental's argument that Parsons is estopped from asserting the plain language of the claim by its remarks to the examiner. Those remarks were made to overcome a § 112 rejection, not to overcome a § 103 rejection based on prior art. Nothing of record indicates that a failure to include the "prior to . . . solution" phrase would have caused continuation of the § 112 rejection, or that claim 1 as it stands is in any manner vague, indefinite, or lacking in utility. Moreover, as Judge Pfaelzer recognized, the phrase omitted from claim 1 is specifically included in claim 11, indicating that claim 1 was allowed without the phrase for reasons other than the cited remarks made to the examiner. *Smith, supra*, at 13, 55 S.Ct. at 284. It is improper for courts to read into an independent claim a limitation explicitly set forth in another claim. *In re Rousso*, 106 USPQ 108, 110 (CCPA 1955). Judge Pfaelzer did not err in finding infringement of claims 1–8 and 12.

### Conclusion

The judgment that the claims of the '877 patent are valid[9] and claims 1–8 and 12 are

---

**8.** Parsons' remarks were: "Thus, it is respectfully submitted that significant utility exists in removing water and any trace amounts of sulfur dioxide from the gas stream prior to contact with an aqueous absorption solution".

**9.** It is not necessary that a district court hold a patent valid. In an appropriate case, it is necessary to hold only that the challenger of a patent's validity failed to carry his burden of proving invalidity. 35 U.S.C. § 282. The result is the same, but the latter holding more accurately dramatizes that it, like all holdings, is based on the record of the case at hand. The latter holding also avoids concern that a patent held valid may be held invalid on a different record in another case. When, however, a challenger has carried his burden of proof it

literally and substantively infringed by the Trencor process, is affirmed.

AFFIRMED.

would appear appropriate to hold the patent invalid, for a holding that the burden had been carried is synonymous with invalidity.