PACIFIC FURNITURE
MANUFACTURING
CO., Plaintiff,

v.

PREVIEW FURNITURE
CORPORATION,
Defendant,

and

PREVIEW FURNITURE CORPORATION and Eli J. Ehrlich,
Counterclaim Plaintiffs,

v.

PACIFIC FURNITURE MANUFACTURING CO., Counterclaim Defendant,

and

PACIFIC FURNITURE MANUFACTURING CO., Counterclaim Plaintiff,

v.

PREVIEW FURNITURE CORPORATION, Furniture Marketing Specialists, Inc., and Eli J. Ehrlich, Counterclaim Defendants.

No. C–81–111–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

Nov. 27, 1985.

Francis M. Pinckney, Charlotte, N.C., Lewis M. Dalgarn, Billy A. Robbins, Nicholas W. Hornberger, Los Angeles, Cal., for Pacific Furniture Mfg. Co.

Gilbert L. Gates, Jan Samet, High Point, N.C., George T. Mobille, Robert W. Adams, Bryan H. Davidson, Washington, D.C., for Preview Furniture Corp. and Eli J. Ehrlich.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This action arises from the alleged infringement by Preview Furniture Corporation (Preview), Furniture Marketing Specialists, Inc. (FMS), and Eli J. Ehrlich, the owner of both corporations, of two chair design patents held by Pacific Furniture Manufacturing Co. (Pacific). Defendants counter by alleging the invalidity of the patents. The following specific issues came before the court for trial without a jury:

(a) Whether Pacific's United States Design Patent No. 258,100 ('100 patent), embodied in its model 120 chair, is valid and, if so, whether Defendants infringed it;

(b) Whether Pacific's United States Design Patent No. 258,101 ('101 patent), embodied in its model 150 chair, is valid and, if so, whether Defendants infringed it;

(c) Whether any infringement by Defendants was willful and deliberate within the meaning of 35 U.S.C. § 284, which permits the court to impose for exemplary purposes up to three times the amount of compensatory damages;

(d) Whether Pacific committed acts of unfair competition, libel, or slander against Defendants by notifying third parties of the alleged infringement; and

(e) Whether the prevailing party in this lawsuit is entitled to attorney's fees under 35 U.S.C. § 285.

Pacific did not pursue at trial its counterclaim against Defendants for unfair competition. By stipulation of the parties, the issue of damages, if any, was reserved for a subsequent proceeding.

The court shall now enter its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52:

## FINDINGS OF FACT

### A. *Parties*

1. Plaintiff Pacific is a California corporation having its principal place of business in Compton, California.

2. Defendant Preview is a North Carolina corporation having its principal place of business in High Point, North Carolina.

3. FMS is a Connecticut corporation having its principal place of business in High Point, North Carolina. FMS acts as the marketing arm of Preview. In addition, all design work commissioned or done personally by Ehrlich for use by Preview is formally produced for FMS, which in turn transfers it to Preview.

4. Defendant Ehrlich is an individual residing in High Point, North Carolina. Ehrlich is the president and sole owner of Preview. He also owns and controls FMS.

### B. *Development of the Pacific 120 and 150 Chairs*

5. Pacific has been in the business of manufacturing furniture and selling it, primarily on the wholesale level, for about thirty years. Its products include upholstered furniture for the commercial and residential markets. Pacific seeks to be a design leader in the furniture field, that is, to continually offer innovative furniture designs. For this purpose, it retains the services of freelance furniture designers. They are typically compensated by royalties based on sales and their names used in advertising and promotion programs. Pacific frequently obtains design patents for the purpose of protecting the uniqueness of its designs and its investment in obtaining them. Pacific's gross sales in 1983 were $20 million.

6. On January 18, 1979, Pacific, as assignee, filed an application for a patent on a chair design which it had commissioned and previously developed into its model 120 chair. On February 3, 1981, design patent no. '100 was issued on the application. The '100 patent depicts a low-back upholstered chair suitable for commercial use.

7. Working from the '100 patent, a different designer employed by Pacific created another chair design which Pacific developed into its model 150 chair. Pacific, as assignee, filed an application for a patent on this design on January 18, 1979. On February 3, 1981, design patent no. '101 was issued on the application. The '101 patent shows a chair that is, in effect, a residential version of the chair depicted in patent no. '100, intended to have a softer and looser appearance.

8. Both the model 120 and model 150 chairs have enjoyed substantial commercial success. Through June 1984 Pacific's gross sales for its 120 chair were almost $1 million and the gross sales for its 150 chair were almost $900,000.00. In terms of sales the two chairs rank in the top half of the furniture items offered by Pacific.

9. Shortly after April 1980, Pacific was informed by one of its sales representatives, Stanley H. Caplan, that Preview was making and selling two chairs, Preview models 806 and 807, very similar to Pacific's 120 and 150 models, respectively, and that Ehrlich had told Caplan that they were in fact copies. Ehrlich claimed that Bloomingdale's department store, one of Preview's customers, had requested him to make the copies. In response, Pacific notified Bloomingdale's by letter from its counsel dated May 20, 1980, that it was seeking patent protection on the two chair designs and would take legal action to enforce its patent rights if and when the patents issued. The letter was followed up by a meeting between Pacific's president, Caplan, and Bloomingdale's vice president, Carl Levine.

10. On September 16, 1980, Pacific's attorneys wrote to Ehrlich at Preview to advise Preview that design patent applica-

tions covering models 120 and 150 had been filed, and that legal action would be forthcoming when the patents were issued. Subsequently, on January 30, 1981, Pacific's counsel sent another letter to Ehrlich at Preview to advise Preview of the imminent issuance of the '100 and '101 patents, and to demand that Preview desist from infringement of such patents. Pacific received no response to either letter. On March 12, 1981, this litigation was commenced. Thereafter, Pacific's counsel sent letters to distributors which Pacific believed might be selling the purportedly infringing Preview chairs to advise them of Pacific's patent rights. Preview has continued to make and sell its model 806 and 807 chairs.

### C. Development of the Preview 806 and 807 Chairs

11. Ehrlich, who has no formal training as a furniture designer, claims to have been the designer of both the Preview 806 and 807 chairs. According to his testimony, the 806 chair had its genesis in a shopping trip he made to New York in 1979. There he purportedly saw a chair manufactured by Shelby-Williams Industries, Inc., as model 7230–19 (the Shelby-Williams chair) which he thought looked unique. He testified that he then obtained a photograph of the Shelby-Williams chair and developed the 806 chair on behalf of FMS and Preview from this photograph in early 1980. Ehrlich stated that he subsequently decided to develop another chair using the frame of the 806 chair, but having a more casual look that would appeal to a different market. This chair became Preview model 807.

12. Ehrlich claims that at the time he designed the 806 and 807 chairs he was totally unaware of Pacific's 120 and 150 chairs and therefore could not have copied them. As discussed more fully below, the court does not accept Ehrlich's testimony as true and finds instead that he copied Preview's 806 and 807 chairs directly from their respective Pacific counterparts. This finding is supported in part by the fact that the Preview chairs are virtually identical in appearance to the Pacific chairs.

13. Ehrlich acknowledged at trial that both the 806 and 807 chairs have been commercially successful for Preview and both are "certainly in the group of our better selling chairs."

### D. Validity and Infringement of the '100 Patent

14. A necessary predicate to a finding of patent infringement is a determination that the patent is valid; an invalid patent cannot be infringed. See Medtronic, Inc. v. Cardiac Pacemakers, Inc., 721 F.2d 1563, 1582–83 (Fed.Cir.1983); Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1541 (Fed.Cir.1983). A patent is presumed to be valid, and the patent statute, 35 U.S.C. § 282, "places the burden of proving facts establishing invalidity on the person asserting invalidity. The patent challenger must establish those facts by clear and convincing evidence, and the ultimate burden of persuasion never shifts from the patent challenger." Jones v. Hardy, 727 F.2d 1524, 1528 (Fed.Cir.1984).

15. The challenger's burden is to show that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. In applying this test, the court must determine: (a) the scope and content of the prior art; (b) the differences between the prior art and the patented design; and (c) the level of ordinary skill in the art at the time the invention was made. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); Litton Systems, Inc. v. Whirlpool Corp., 728 F.2d 1423, 1441–43 (Fed.Cir.1984) (hereinafter cited as Litton). Secondary considerations such as commercial success are also relevant to the issue of validity. Graham v. John Deere Co., 383 U.S. at 17–18, 86 S.Ct. at 693–94; Litton, 728 F.2d at 1441.

16. In considering the validity of design patents, emphasis must be placed on a com-

parison of the patented design *as a whole* with what is disclosed by the prior art *as a whole.* The Court of Appeals for the Federal Circuit observed in *Litton,* 728 F.2d at 1443:

> We note that we are not just separating out individual elements used here to create a new, composite design. [Defendant] ..., for example, erroneously uses a piecemeal approach, one in which it takes the individual elements, item by item, and tries to show us that they each exist somewhere in the prior art. 'That all elements of an invention may have been old (the normal situation), some old and some new, or all new, is[,] however, simply irrelevant.' *Environmental Designs Ltd. v. Union Oil Co. of California,* 713 F.2d 693, 698, 218 USPQ 865, 870 (Fed. Cir.1983).

*See also Schnadig Corp. v. Gaines Manufacturing Co.,* 177 U.S.P.Q. 313, 319–20 (W.D.Tenn.1973), *aff'd,* 494 F.2d 383 (6th Cir.1974) (design patent on upholstered sofa upheld) (hereinafter cited as *Schnadig*).

■ 17.  In the present case, the principal item of prior art relied upon by Defendants to establish the obviousness of the '100 patent design is the Shelby-Williams chair which Ehrlich claimed he used in developing the Preview 806 chair. The court finds that the Shelby-Williams chair has a substantially different overall appearance from the '100 patent design and that the '100 patent design is not an obvious extension of the Shelby-Williams chair's design.

18.  The disparity in overall appearance between the Shelby-Williams chair and the '100 patent design, as embodied in the Pacific 120 chair, can be traced to no less than eight specific design differences:

(1) the Shelby-Williams chair has a tight seat, whereas the 120 chair has a loose cushion;

(2) the Shelby-Williams chair has an open base beneath the seat, whereas the 120 chair has a closed or filled in base;

(3) the height of the 120 chair is significantly less than that of the Shelby-Williams chair (about 10%);

(4) the width of the 120 chair is significantly greater than that of the Shelby-Williams chair (about 18%);

(5) the depth of the 120 chair is significantly greater than that of the Shelby-Williams chair (about 20%);

(6) the cushion in the 120 chair projects outwardly in front of the arms, whereas in the Shelby-Williams chair the seat is recessed;

(7) the base of the 120 chair also projects outwardly in front of the arms, whereas in the Shelby-Williams chair there is no base; and

(8) the loose cushion in the 120 chair has a curved or bull-nose configuration, whereas the tight seat in the Shelby-Williams chair has a flat appearance.

The three changes in the width, depth and height of the 120 chair are of particular importance because they give it entirely different proportions as compared with the Shelby-Williams chair. Specifically, they provide the 120 chair a lower, wider, and more contemporary look.

19.  Defendants have also offered documentary evidence of a Mac brand chair to establish the obviousness of the '100 patent design. The court finds that the Mac chair is substantially different in overall appearance from the '100 patent design and that the '100 patent design is not an obvious adaptation of the Mac's design. The difference in overall appearance between the Mac design and the '100 patent design, as embodied in the Pacific 120 chair, is rooted in the following factors:

(1) the 120 chair does not have a wraparound back, whereas a distinctive feature of the Mac chair is such a back having sharply curved end portions that are flush with the sides of the chair;

(2) the seat cushion of the 120 chair is quite thick with a distinctive curved or bull-nose curvature at its front face, whereas the Mac chair has a thin, flat seat cushion that has a distinctive down-

ward taper from front to back and a pointed front face;

(3) the 120 chair is deliberately formed with a tight-fitting or tailored look without any back cushion, whereas in one version of the Mac chair the back includes a thick cushion arrangement having a creased or fluffy look, and the other version of the Mac chair also has a separate back cushion member received within the curvatures of the back of the chair;

(4) the shape of the arms of the 120 chair is tall and narrow with a flat bottom and a curved top, whereas the Mac chairs have sides that are essentially rectangular in shape with flat bottom and top surfaces and have a low and wide appearance;

(5) the seat cushion and base of the 120 chair protrude prominently outwardly in front of the arms, and this feature is not included in the Mac chair.

20. Defendants' expert witness, whose expertise lies primarily in the interior design field and who has no experience in designing furniture for the mass market, offered some general and uncorroborated testimony to the effect that all of the individual features of the 120 chair, taken in isolation, were known in the prior art. This evidence, too, fails to establish the obviousness of the '100 patent design. It is of limited probative value on the facts presented because it is unsupported by other evidence. *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1261 (8th Cir.1980). Moreover, such a piecemeal analysis is of questionable relevance. *Litton*, 728 F.2d at 1443; *Schnadig*, 177 U.S. P.Q. at 319–20.

21. The purported obviousness of the '100 patent design is further undermined by the commercial success of both Pacific's 120 chair and Preview's 806. *Litton*, 728 F.2d at 1441; *Schnadig*, 177 U.S. P.Q. at 317. Commercial success is a trustworthy indicator of non-obviousness here because undisputed testimony established that the overall appearance of upholstered furniture is the most important factor con-

sidered by those purchasing it and therefore largely determinative of its commercial success. *See Litton*, 728 F.2d at 1443. The fact that the '100 patent design was imitated also substantiates its non-obviousness. *Schnadig*, 177 U.S.P.Q. at 317–18. The court concludes that the differences between the '100 patent design and the prior art are such that the '100 patent design as a whole would not have been obvious to a person having ordinary skill in the art at the time the design was created.

■ 22. The issue then becomes whether the '100 patent was infringed. For over 100 years, the test of infringement for a design patent has remained unchanged:

[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1871); *Litton*, 728 F.2d at 1444.

23. There is seemingly no dispute in the present case about infringement since all of the witnesses who compared the patented 120 chair with Preview's 806 chair concluded they were virtually identical. Defendants' own expert witness affirmed that the two chairs are virtually identical in overall design, and even Ehrlich himself testified that an ordinary purchaser seeing the 806 chair and the 120 chair would be likely to think he was looking at the same chair. This testimony simply confirms what is otherwise apparent from a comparison of the two chairs. The court accordingly finds that the 806 chair constitutes an infringement of the '100 patent.

### E. *Validity and Infringement of the '101 Patent*

■ 24. Defendants' attack on the validity of the '101 patent is similar to that discussed in connection with the '100 patent; they rely primarily on one or two prior art documents, each of which includes iso-

lated features of the '101 patent design. The principal prior art reference cited by Defendants is the '100 patent, the commercial embodiment of which by Pacific (i.e., the 120 chair) was on sale prior to the invention of the 150 chair. The court finds that the '101 patent design has a substantially different overall appearance from the '100 patent design and is not an obvious extension of the '100 patent design.

25. The disparity in overall appearance between the '101 patent design, as embodied in the 150 chair, and the '100 patent design, as embodied in the 120 chair, can be traced to the following specific design differences:

(1) the seat in the 150 chair has distinctive sewn seams not present in the 120 chair, and the contours of the respective cushions are considerably different;

(2) the 150 chair has a distinctive slit formed in its back through which fabric is drawn to form a crease, whereas the 120 chair has no such slit;

(3) the interior surface of the back of the 150 chair has a rounded contour, whereas the corresponding surface of the 120 chair is flat;

(4) there is a noticeable overhang extending from the top of the back of the 150 chair, whereas the 120 chair back is straight;

(5) there is also a prominent overhang extending outwardly from the top sides of the 150 chair, whereas the side faces of the 120 chair are entirely flat;

(6) the arms of the 150 chair have a distinctive rounded appearance from inside the arm to the outside, whereas the arms of the 120 chair are essentially flat and thicker in overall dimensions;

(7) the top corners on the arms of the 150 chair do not appear rounded, whereas they do appear rounded on the 120 chair;

(8) the 150 chair includes a unique and distinctive combination of complementary pleats which appear in the arm, the seat cushion and the back which, in combination, is a distinctive feature of the 150 chair, whereas the 120 chair has no pleats at all; and

(9) the 150 chair, as a whole, has a loose, fluffy look, whereas the 120 chair, as a whole, has a tight-fitting or tailored look.

26. Defendants also cite an earlier Pacific chair, model 1536, having a back formed with a slit, in order to establish the obviousness of the '101 patent design. Again, the court finds that the overall design of this chair differs substantially from that depicted in the '101 patent such that the '101 patent design is not an obvious extension of the model 1536. Among the reasons for the difference in overall appearance between the model 1536 and the '101 patent design, as embodied in the 150 chair, are the following: the 1536 chair has two sides which are tilted forward in a distinctive manner; it does not include the above-mentioned distinctive combination of complementary pleats in the seat, back and arms as shown in the 150 chair; it has a distinctive bull-nose seat cushion which is devoid of the seam formed in the flat seat cushion shown in the 150 chair; it does not include the distinctive overhangs at the top of the arms and back found in the 150 chair; and the relative proportions in the model 1536 between the seat cushion and the base are considerably different from the corresponding proportions in the 150 chair. Additionally, as noted by Plaintiff's expert, the 1536 has exposed wings, is wider, has heavier arms and a heavier seat cushion as compared to the 150 chair.

27. Lastly, Defendants rely on a prior art Clyde Pearson chair model 3018, although the testimony relating to this chair is sparse. Ehrlich testified that if you removed the two cushions on the Pearson chair, it would be "very similar" to the Preview 807 chair. Defendants' expert witness stated that the Preview model 807 is typical of prior art chairs having a protruding base portion and a loose cushion, such as the Pearson chair. The court finds this evidence inadequate to establish that the '101 patent design is an obvious extension of the Pearson chair design in view of

the substantial disparity in overall appearance between the designs.

28. The difference in overall appearance between the Pearson chair and the '101 patent design, as embodied in the 150 chair, derives from the following factors:

(1) the sides and back of the Pearson chair are integrally formed in a U-shape, whereas the 150 chair includes separate sides and a separate back;

(2) the height of the back of the Pearson chair is the same as, and a continuation of, the height of the sides, whereas the separate back in the 150 chair extends substantially above the sides;

(3) the Pearson chair is completely devoid of any prominent slit and pleat arrangement in the back of the chair, and, indeed, the back of the Pearson chair is a pair of juxtaposed loose cushions which constitute a prominent feature of the chair's design;

(4) the above-discussed complementary arrangement of similar pleats in the arms, back and cushion of the 150 chair are not found in the Pearson chair; and

(5) the Pearson chair does not include the distinctive fluffy treatment provided in the 150 chair at the top of its back and at the tops of the two arms.

29. The purported obviousness of the '101 design also tends to be discredited by the commercial success it has enjoyed through the sale of both the Pacific 150 chair and the Preview 807 chair. In addition, it is significant that Preview, a direct competitor of Pacific, copied the design of the '101 patent, especially since FMS on behalf of Preview maintained under contract a number of its own furniture designers, as did Pacific. The court concludes that the differences between the '101 patent design and the prior art are such that the '101 patent design would not have been obvious to a person having ordinary skill in the art at the time the design was created.

30. Defendants attack the '101 patent on the independent grounds that the application therefor wrongfully failed to disclose the '100 patent design and the Pacific 1536 chair as prior art. They invoke the rule that proof by clear and convincing evidence of inequitable conduct, including fraud and gross negligence, in withholding information from the Patent and Trademark Office can render the patent involved unenforceable if such information is shown by clear and convincing evidence to be material. *E.g., J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559–60 (Fed.Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985) (hereinafter cited as *J.P. Stevens* ); *Driscoll v. Cebalo,* 731 F.2d 878, 884 (Fed.Cir.1984). The law permits inequitable conduct to be established by direct or circumstantial evidence. In the case of gross negligence, it is sufficient that the actor, judged by a reasonable person standard, should have known the materiality of the facts withheld. *J.P. Stevens,* 747 F.2d at 1560; *Driscoll v. Cebalo,* 731 F.2d at 884. Non-disclosed information is material when, among other circumstances, a reasonable examiner would have considered it important in deciding whether to allow the application to issue as a patent. *J.P. Stevens,* 747 F.2d at 1559; *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1362 (Fed.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Simple negligence or erroneous judgment made in good faith does not render a patent unenforceable. *J.P. Stevens,* 747 F.2d at 1560; *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383 (Fed.Cir.1983).

31. The Defendants have failed to meet their burden of proof. They have offered no direct evidence of inequitable conduct. In the case of the Pacific 1536 chair, no inference of such conduct is proper because the lack of similarity between the 1536 chair and the '101 patent design renders the materiality of non-disclosure questionable. In the case of the '100 patent design, inequitable conduct cannot properly be inferred because Pacific had already disclosed the '100 patent design to the Patent and Trademark Office through the application for the '100 patent. In addition, the fact that the same examiner reviewed both the '100 and '101 patent appli-

cations and that patents on both were issued the same day places in doubt the importance which could reasonably have been attributed to any further disclosure of the '100 patent design by Pacific. *See J.P. Stevens,* 747 F.2d at 1559–60; *Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1456 (Fed.Cir.1984); *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d at 1383–84.

■ 32. The question now becomes whether the '101 patent was infringed. All of the witnesses at trial testifying on the issue, including those of Defendants, acknowledged that Preview's 807 chair is virtually identical to Pacific's 150 chair. Ehrlich himself has admitted that an ordinary purchaser, upon seeing the Preview 807 and the Pacific 150, would be confused into thinking they were the same chair. The court, too, finds them to be essentially identical. The court concludes that the 807 chair constitutes an infringement of the '101 patent.

### F. *Willful and Deliberate Infringement*

■ 33. Having found that the 806 and 807 chairs constitute infringement of the '100 and '101 patents, respectively, the next issue to be addressed is whether such infringement was willful and deliberate. If such conduct is found, 35 U.S.C. § 284 permits the court in its discretion to impose for exemplary purposes up to three times the amount of compensatory damages. There is abundant evidence to support Plaintiff's contention that Defendants' infringement was willful and deliberate.

34. First, there is the fact that the Preview chairs are virtually identical to their Pacific counterparts. The experts for both Pacific and Preview testified that it would have been very unlikely for a designer working independently and without access to the Pacific 120 chair to develop the Preview 806 chair design. Both experts termed the likelihood of a designer's developing both the Preview 806 and 807 chairs independently from the Pacific 120 and 150 chairs as significantly more remote.

35. Additionally, there is substantial evidence that Ehrlich, at the time he designed the 806 and 807 chairs on behalf of FMS and Preview, had direct access to Pacific's chairs. Ehrlich himself, prior to beginning the prototype design of either the 806 or 807 chairs, ordered a Pacific 150 chair from 39 East, Inc., a dealer for both Pacific and Preview in Miami, Florida. The 150 chair was delivered to Preview's plant in High Point, North Carolina, to the attention of Eli J. Ehrlich. There is no documentation indicating the 150 chair ever left the premises of Preview, although such documentation would normally have been generated if there had been any reshipment of the chair. According to evidence at trial, it is highly unusual for one competitor to purchase a chair manufactured by another competitor, and such orders arouse suspicion because of the inference that the chair is to be copied.

36. Ehrlich may have obtained access to the Pacific 120 chair, as well as the Pacific 150 chair, through his admitted practice of visiting dealers who were displaying Pacific furniture. According to his testimony, he would look at every piece of furniture on the floor during these visits in order to determine what the competition was doing in terms of design. Because the Pacific 120 and 150 chairs were among the better-selling products of Pacific, it is likely that they were on display in showrooms which Ehrlich visited prior to the time he developed the 806 and 807 chairs.

37. In addition, there is ample evidence that Preview knew of Pacific's patent rights in the 120 and 150 chairs. Such evidence includes the letters from Pacific's attorneys to Preview dated September 16, 1980, and January 30, 1981, and Ehrlich's testimony regarding his awareness of these letters.

38. The circumstantial evidence that Ehrlich copied Pacific's 120 and 150 chairs is confirmed by Ehrlich's own admission to that effect in his conversation with Caplan. In that conversation, Ehrlich stated that he was not proud of what he had done and

that his sales of the copied chairs would be limited to certain markets. The conversation was witnessed by a disinterested third party, Lionel Asher, who at trial testified to Ehrlich's inculpatory statements.

39. Although Ehrlich testified that he never made such statements to Caplan, the court discredits this denial. One reason is an inconsistency in his testimony. Ehrlich initially testified in a pre-trial deposition that a Mr. Poverman was also present during the conversation and presumably could verify Ehrlich's version of what was said. However, at trial Poverman did not appear and Ehrlich changed his testimony by stating that he did not know if Poverman was present. In addition, although Ehrlich was aware through pre-trial depositions that Caplan could testify that Ehrlich admitted copying the Pacific chair, Ehrlich claims that he did not contact Poverman to determine if Poverman could refute Caplan's story until the day trial began. Given the gravity of Caplan's potential testimony, it appears highly unlikely that if Ehrlich believed Caplan's version was false he would have waited until such a late date to make an effort to contact Poverman.

40. Independent of this evidence, the court made a careful evaluation of Ehrlich's credibility as a witness. His testimony was replete with indicia of unreliability: evasiveness; unforthright demeanor; inconsistencies; self-serving approach; and unreasonableness in many assertions made. These considerations alone compel the court to discount Ehrlich's testimony regarding his conversation with Caplan, as well as much of his other testimony. The court concludes that Defendants willfully and deliberately copied the patented Pacific 120 and 150 chairs in arriving at the 806 and 807 chair designs. Compensatory damages found by the court to be owing Pacific shall accordingly be trebled.

41. Preview, in trying to avoid a finding of willful and deliberate infringement, contends that it relied upon advice of counsel. However, recent decisions of the U.S. Court of Appeals for the Federal Circuit, *Underwater Devices, Inc. v. Morrison-*

*Knudsen Co.,* 717 F.2d 1380 (Fed.Cir.1983), and *Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573 (Fed.Cir.1983), make it clear that Preview cannot rely on this defense on the facts presented.

42. In *Underwater Devices*, the court starts with the caveat that a potential infringer with actual notice of another's patent rights "has an affirmative duty to exercise due care to determine whether or not he is infringing ... [which] duty includes, *inter alia*, the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity." 717 F.2d at 1389–90 (emphasis in original). The potential infringer must then weigh the nature and quality of the legal advice received and the basis upon which the advice is given. In *Underwater Devices*, the infringer did not establish that the invalidity opinion it obtained was based on a study of file history of the patent in question or demonstrate "to the district court that its counsel's opinion, without any analysis of the file histories, was in fact thorough and competent." *Id.* at 1390. The court indicated that the infringer could have discharged its affirmative duty to exercise due care by obtaining an opinion which "contained within its four corners a patent validity analysis, properly and explicitly predicated on a review of the file histories of the patents at issue, and an infringement analysis." *Id.*

43. In the instant case, the only testimony on Preview's receipt of legal advice came from Ehrlich while under examination by Plaintiff's counsel. He testified that he did not know whether anyone at Preview ever instructed its attorneys to make a study of the validity of the two Pacific patents and did not recall ever hearing the word "infringement" mentioned. He recalled merely that an officer of Preview had obtained information to the effect "that it was not a valid patent and that was the extent of it." Moreover, there is no evidence indicating that Preview's attorney obtained file histories of the two Pacific patents from the Patent and Trademark Office, or that any opinions which may

have been rendered on the validity of the Pacific patents were based on a study of these file histories. While Ehrlich did recall that "some people from the attorney's office spent quite a bit of time at the furniture library in High Point," he did not know whether this visit occurred before or after Preview had been told the patents were invalid. The lack of supporting evidence renders any legal advice Preview received "bald, conclusory and unsupported remarks" inadequate to shield it from willful and deliberate infringement. *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d at 1390; *see also Scott Paper Co. v. Moore Business Forms, Inc.*, 594 F.Supp. 1051, 1084 (D.Del.1984).

### G. *Unfair Competition*

44. Preview and Ehrlich assert in a counterclaim that Pacific engaged in acts of unfair competition. These allegations are based on two sets of correspondence by Pacific's counsel: their letter to Bloomingdale's vice president Levine dated May 20, 1980; and their letters after issuance of the patents to potential distributors of the infringing Preview chairs. ·

45. The court finds the letter to Bloomingdale's to be proper. It simply advised Bloomingdale's of Pacific's intention to protect its patents if and when they issued. Specifically, the letter sets forth the fact that patent applications had been filed; includes illustrations of the chairs covered by the applications; repeats the substance of Ehrlich's claim that Bloomingdale's commissioned him to copy the chairs; and cautions Bloomingdale's that *if* these Preview chairs infringe on Pacific's patents when they issue Pacific will take appropriate legal action. Although evidence suggests that Preview's business with Bloomingdale's may have decreased as a result of the letter, that fact alone does not render the letter an act of unfair competition.

46. The court finds that the letters to distributors were also lawful. 35 U.S.C. § 287 sets forth requirements for a patentee who seeks to enforce his right under a patent. The language of this section and applicable case law make clear that it is not only appropriate for a patentee to notify infringers of the applicability of the patent, but may well be mandatory for a patentee to do so. *See Airtex Corp. v. Shelley Radiant Ceiling Co.*, 536 F.2d 145, 155–56 (7th Cir.1976); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 489 F.Supp. 174, 180 (N.D.Ga.1980), *aff'd*, 684 F.2d 821 (11th Cir.1982); *Applied Biochemists, Inc. v. A & V, Inc.*, 353 F.Supp. 949 (E.D.Wis. 1973); *FMC Corp. v. City of Greensboro*, 208 F.Supp. 494, 503–04 (M.D.N.C.1962) (Hayes, J.), *rev'd on other grounds*, 326 F.2d 581 (4th Cir.1964).

47. In the present case, the appropriateness of the letters is apparent. They were sent after Pacific had failed on two occasions to receive responses from Preview regarding its patent rights. The letters were all addressed to entities which had been identified through an investigation by Pacific as potential infringers. These potential infringers may or may not have had a product of the patentee to examine for appropriate notices and markings, creating a need for Pacific as the patentee to advise them independently of the patents. In order to accurately identify the chairs, the letters included illustrations of them. Finally, the evidence establishes that the letters were sent in good faith and under the continuing impression that an actual patent infringement had occurred and that further infringement was contemplated. Thus, both of Defendants' counterclaims for unfair competition must fail.

### H. *Libel and Slander*

48. Preview and Ehrlich also claim that the letters by Pacific's counsel to Bloomingdale's and the distributors constitute libel and slander. The claim lacks merit. As the court has previously discussed, the letters were truthful. Moreover, Preview's actions implicated legally cognizable interests of Pacific's which it had a qualified privilege to protect. *See Goforth v. Avemco Life Insurance Co.*, 368 F.2d 25, 31 (4th Cir.1966); *see generally* W. Prosser, *Handbook of the Law of Torts* § 115, at 789–91 (4th ed. 1971).

49. Finally, Preview and Ehrlich contend that certain correspondence directed by Pacific's counsel to attorneys and previous owners of 39 East, Inc., constitute acts of libel and slander. This claim also has no merit. Pacific's counsel undertook this correspondence in good faith for the purpose of obtaining supporting evidence for use in this action that Ehrlich had purchased a Pacific 150 chair from 39 East, as was reported to Pacific by personnel at 39 East. The correspondence was accordingly privileged as having been made by an attorney incident to litigation. *See Hoover v. Van Stone,* 540 F.Supp. 1118 (D.Del.1982); *Restatement (Second) of Torts* § 586 & comment a (1976).

## I. *Attorney's Fees*

50. Under the provisions of 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The award is discretionary with the trial court and may be properly made where there is a "determination that the infringer had no reasonable basis for believing it had a right to do the acts," including a failure to meet the affirmative "duty … to obtain competent legal advice *before* initiating possibly infringing action." *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1548 (Fed. Cir.1984) (emphasis added).

51. As discussed above, Preview's president Ehrlich, acting on behalf of Preview and FMS, deliberately copied Pacific's patented chair designs. No evidence has been presented which indicates that there was a substantial basis for any Defendant's believing it had a right to proceed withsuch willful and deliberate infringement. For these reasons alone, an award of reasonable attorney's fees is warranted in this case. *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 667 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

52. Additionally, the bad faith exhibited by the Defendants during the course of this litigation provides a separate and distinct basis upon which attorney's fees should be awarded. *See id.; Landes Manufacturing Co. v. Chromodern Chair Co.,* 203 U.S.P.Q. 337, 341 (C.D.Cal.1978). Throughout this entire litigation, Preview and Ehrlich have consistently denied that the 806 and 807 chairs were copied directly from the 120 and 150 chairs and even provided Plaintiff, early in the litigation, with an interrogatory answer that was admittedly false. It stated that Preview first learned of Pacific's 150 chair on September 16, 1980 (the date it received the initial notice letter from Pacific), when in fact Ehrlich had ordered a 150 chair from 39 East in late 1979, several months prior to the time he began to build the prototype for the 806 and 807 chairs. As the court noted in an order dated May 4, 1984, granting a motion by Pacific to compel, "[t]he responses of defendant to plaintiff's interrogatories demonstrate an unwillingness to participate in discovery as is required by the rules." Ehrlich's intransigence in refusing to acknowledge what the evidence in this case clearly establishes, namely that Ehrlich not only had direct access to the 120 and 150 chairs but also copied them, and the acts of Preview in supplying Plaintiff with misleading and false discovery information, combined to require Plaintiff to go to substantial expense in pursuing the evidence that would establish the actual facts.

53. While it is true that some of the legal expenses incurred by Plaintiff in this case were expended in connection with the counterclaims of Preview and Ehrlich based on Plaintiff's alleged libel and slander, the claim of libel and slander itself was the direct result of Plaintiff's efforts to obtain evidence of Ehrlich's access to, and copying of, Plaintiff's chairs. Had Preview and Ehrlich proceeded with the patent infringement claim in good faith the alleged libel and slander would never had occurred. Moreover, as discussed above, there was no proper basis for the libel and slander claim in any event. Accordingly, the court concludes that this is an exceptional case under 35 U.S.C. § 285 and that Plaintiff is

entitled to reasonable attorney's fees in connection with this litigation.

For the foregoing reasons, the court makes the following

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338 and personal jurisdiction over all parties.

2. Plaintiff's '100 and '101 design patents are valid, covering inventions which were novel and which, when compared to the prior art, would not have been obvious to a person having ordinary skill in the art at the time the inventions were made.

3. Preview's 806 chair is an infringement of the '100 patent and Preview's 807 chair is an infringement of the '101 patent in that an ordinary purchaser seeing the respective chairs of Preview and Pacific would have been deceived into believing they were the same chair.

4. Defendants' infringement of the '100 and '101 patents was willful and deliberate, entitling Pacific to treble the amount of compensatory damages under 35 U.S.C. § 284.

5. Pacific is entitled to an injunction against Defendants to prevent further infringement of the '100 and '101 patents.

6. Pacific is entitled to compensatory damages against Defendants in an amount to be determined in a separate proceeding, if necessary.

7. By reason of the willful and deliberate infringement by Defendants and the improper conduct of Preview and Ehrlich during the course of this litigation, this is an exceptional case under 35 U.S.C. § 285 and Pacific is entitled to reasonable attorney's fees. The amount of such fees shall be determined by the court in a separate proceeding, if necessary.

8. Pacific did not commit unfair competition, and libel and slander against Preview, and Preview's counterclaims alleging such conduct shall be dismissed.

9. Pacific shall be awarded its costs in connection with this litigation.

Within thirty (30) days of the date of this memorandum opinion, the parties are directed to confer and attempt in good faith to reach an agreement regarding the amount of compensatory damages and attorney's fees and expenses to which Pacific is entitled. Pacific shall notify the Clerk's Office promptly if such agreement is reached. If no agreement is reached, the parties shall file with the court a report of their efforts to reach agreement. The court shall thereafter schedule a hearing on any unresolved matters.

A judgment for Pacific shall be entered contemporaneously herewith.

## JUDGMENT

This case came before the court for trial without a jury. For reasons set forth in an opinion filed contemporaneously herewith, the court has determined that judgment should be entered for Plaintiff on its infringement claims and that all other claims should be dismissed;

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED that the model 806 and 807 chairs of Defendant Preview Furniture Corporation constitute willful and deliberate infringement by Defendants, that is, Preview Furniture Corporation, Furniture Marketing Specialists, Inc., and Eli J. Ehrlich, of United States Design Patent Nos. 258,100 and 258,101 held by Plaintiff Pacific Furniture Manufacturing Co.; and

IT IS FURTHER ORDERED that Defendants shall pay Plaintiff treble the amount of compensatory damages owing for such infringement plus attorney's fees and expenses, which amounts shall be determined by the court in a subsequent proceeding absent agreement by the parties on such amounts; and

IT IS FURTHER ORDERED that Defendants are ENJOINED from any further acts constituting infringement of the aforementioned design patents; and

IT IS FURTHER ORDERED that all claims for which relief has not been granted herein are DISMISSED with prejudice.

All costs shall be taxed to Defendants.